IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

KEITH RYAN and
LINDA RYAN,

                    Plaintiffs,                    OPINION & ORDER

          v.                                       13-cv-782-jdp

SAWYER COUNTY, JAMES
MEIER, and LAURA POPPE,

                    Defendants.

Plaintiffs Keith and Linda Ryan own the Edelweiss Motel in Hayward, Wisconsin. The Ryans are part of an unhappy family, whose disputes sometimes boil over requiring law enforcement officers to keep the peace. This lawsuit arises from three interactions between the Ryans and the Sawyer County sheriff's department. The Ryans contend that the sheriff's department unlawfully seized their property on two occasions and falsely arrested Keith on a third. They bring claims for the deprivation of their federal constitutional rights under 42 U.S.C. § 1983 and they bring parallel state law claims for the deprivation of their rights under Wisconsin law.

Defendants have moved for summary judgment on all claims. Dkt. 13. The court will grant the motion. The Ryans have adduced no evidence that the acts that allegedly violated their rights were taken pursuant to any Sawyer County policy or custom, and thus the claims against Sawyer County itself or any claims against Sheriff Meier or Deputy Poppe in their official capacities must fail. Sheriff Meier did not cause or participate in an alleged constitutional deprivation, and so the claims against Meier in his individual capacity must fail. And finally, the individual capacity claims against Deputy Poppe must fail because she had

probable cause to arrest Keith Ryan and, further, she is entitled to qualified immunity against such claims as the Ryans'.

UNDISPUTED FACTS

The following facts are, except where noted, undisputed. The Ryans' claims arise out of three incidents, spanning approximately two years, involving Sawyer County law enforcement personnel.

### A.  September 2009 "go-cart incident"

The Ryans had the following property at the Edelweiss Motel: a truck, a tractor, a trailer, a go-kart, and a chainsaw. William Drake (Keith Ryan's son-in-law, married to Keith's daughter, Kortney) contended that all this property was his, and on September 4, 2009, he came to the Edelweiss Motel to get it back. The parties agree that the truck was owned by Drake. Keith, an auto mechanic by training, had been performing repairs on the truck. The parties also apparently agree that Drake owned the trailer and the chainsaw, but the Ryans contend that they owned the tractor and the go-cart.

Drake's efforts to retrieve the property were unsuccessful, and someone called the Sawyer County sheriff's office to report a disturbance at the motel. Sawyer County dispatch sent Deputy Sean Anderson to the motel. When he arrived, Keith yelled at Deputy Anderson to "Get the fuck off my property," but Keith ultimately obeyed Deputy Anderson's orders to return to the motel office. While Deputy Anderson spoke with Drake, Officer Kastern of the Hayward Police Department arrived and spoke with Keith. Drake told Deputy Anderson that he came to pay a debt and that he wanted to get his property—a truck, trailer, tractor, chainsaw, and go-cart—from the premises. Meanwhile, Keith told Officer Kastern that he would allow Drake to take the truck if Drake paid the $100 that Keith has spent on parts for the truck.

After Keith received the payment, Keith and Linda went to the garage and pushed out Drake's truck. Officer Kastern told Deputy Anderson that Keith had consented to Drake's taking the property from the motel.[1] Linda then saw Drake hooking up the trailer, with the go-cart on it, to his truck. Linda tried to pull the go-cart off the trailer and told Sawyer County deputies (Deputies Kornbroke and Hoehne had arrived at the scene by then) that the go-cart belonged to her and Keith. Officer Kastern told Linda that the dispute over the property was a civil matter and she could go to court to resolve it, but, because the go-cart had Drake's name on it, the go-cart would be left on the trailer to go with Drake. Drake removed the truck, trailer, chainsaw, and go-cart from the premises. No one had keys to the tractor; Drake was advised to call the sheriff's department when he had his tractor key and that someone would accompany him when he went to retrieve the tractor. The record does not reflect the fate of the tractor.

Neither Sheriff Meier nor Deputy Poppe were on the scene that day, and they did not participate in the incident.

The day after the go-cart incident, the Ryans spoke with Sheriff Meier at the sheriff's department. The Ryans complained about the deputies' entry onto their property, their treatment of them, and their facilitation and participation in the removal of the tractor and go-cart from their premises. Meier responded that he was "done with" the incident and that he would be "doing nothing about it."

### B. September 2010 "baseball incident"

Keith Ryan's father, Dr. John Ryan, had been married to Maureen Ryan for 34 years, when John died in 2009. Keith was John Ryan's child from a previous marriage. In October

---

[1] Keith contends that he did not tell Officer Kastern that Drake could take the tractor or the go-cart. But plaintiffs adduce no evidence to dispute that Officer Kastern told Deputy Anderson that Keith had consented to the removal of all the property.

2009, Sawyer County Deputy Craig Depew spoke with Maureen at her home regarding baseballs autographed by Babe Ruth. Maureen told Deputy Depew that the baseballs had belonged to John Ryan, and that by virtue of his will, she now owned all his personal property, including the baseballs, which were now missing from the safe where they had been kept. Maureen told Deputy Depew that she believed that Keith knew the combination to the safe and that he had taken the baseballs from her house without permission while she was away. According to Deputy Depew, during the investigation, Keith did not claim that he owned the baseballs.[2] Deputy Depew did not believe that he had strong evidence against Keith at the time, and the case of the stolen Babe Ruth baseballs remained unresolved.

About a year later, the Sawyer County sheriff's department received a complaint that Keith was a convicted felon who had firearms at the motel. Investigator Ross confirmed Keith's criminal record and corroborated the information that Keith possessed firearms. Investigator Ross sought and obtained a search warrant for the Ryan residence, which Sawyer County deputies executed on September 3, 2010. Linda was present for the search. Sawyer county deputies located and took possession of several firearms and a quantity of ammunition. The Ryans raise no objection to the warrant or the search and seizure of the firearms.

But during the search, Sawyer County Sergeant Rick Anderson found the autographed baseballs in a dresser, and the deputies took possession of the baseballs along with the firearms. Linda objected. Investigator Ross told Linda that he would be taking the baseballs because they had been reported stolen and that Keith was the only suspect. On October 18, 2010, the baseballs were returned to Maureen at the direction of Investigator Ross. In March 2013, at the conclusion of the criminal case against Keith (he pleaded guilty to one count of being a felon in

---

[2] In this litigation, however, Keith contends that John Ryan had given the baseballs to Keith before he died.

possession of a firearm), he sought the return of the seized property. At that point, the Ryans learned that the baseballs had been returned to Maureen.

Neither Meier nor Poppe participated in the search or the seizure of the property from the Ryan residence. Neither Meier nor Poppe were involved in the return of the baseballs to Maureen.

### C.  September 2011 "arrest incident"

John Kennedy was a paying guest at the Ryans' motel in September 2011. John allowed his brother Steve to stay with him, even though the Ryans had informed him repeatedly that Steve was not permitted on the premises because of his excessive drinking and disruptive behavior.

On September 13, 2011, Sawyer County Deputy Poppe was dispatched to the premises to investigate John's complaint that Keith was yelling and swearing at him. Town of Hayward Police Chief Hall arrived at the scene shortly thereafter. Deputy Poppe first spoke with John, who told her that Keith "got in his face" and started yelling "you mother fucker—I told you I did not want that cocksucker [Steve] on my property!" According to John, Keith's outburst was triggered by John telling Keith that he was going to give a bicycle to a co-worker at Dairy Queen, rather than leave it at the Edelweiss Motel. Also according to John, Keith further exclaimed, "You get your fucking brother out of here—this is my place and I'll fuck you!," and Keith put his fist in John's face in a threatening manner. John told Deputy Poppe that both he and Steve were concerned for their safety because Keith was unpredictable and crazy. Deputy Poppe then spoke with Steve, who also claimed that he heard Keith yell at John, "I told you I didn't want that cocksucker on my property."

Deputy Poppe then spoke with the Ryans, who were not disorderly in dealing with Deputy Poppe. She told them that John had made a complaint of disorderly conduct against Keith based on abusive and threatening conduct toward John. The Ryans disputed John's account of the conversation; they said that Keith was not abusive, threatening, or disorderly—he simply insisted that John and Steve vacate the premises. The Ryans told Deputy Poppe and Chief Hall to speak with witnesses who had heard the conversation: Valerie Stone, Richard Stone, and Todd Kavanagh. Deputy Poppe spoke to Stone; the record is not clear whether she spoke to the other witnesses. Ultimately, Deputy Poppe determined that she had probable cause to arrest Keith for disorderly conduct, which she did.

Sheriff Meier was not on the scene that day, and he did not participate in the events that transpired.

ANALYSIS

The Ryans contend that defendants violated their rights in three ways: (1) by unlawfully seizing the tractor and go-cart; (2) by unlawfully seizing the Babe Ruth baseballs; and (3) by arresting Keith without probable cause.

The Ryans assert these claims under federal law, specifically 42 U.S.C. § 1983. Section 1983 provides in relevant part that "[e]very person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action." Thus, this court has federal question jurisdiction under 28 U.S.C. § 1331. The Ryans' also assert claims for the same allegedly wrongful acts under Wisconsin state law. The court has supplemental jurisdiction over the Ryans' state-law claims, because they are substantially related to the federal claims, under

6

28 U.S.C. § 1367. Indeed, both parties regard the state law claims as identical to the federal claims because neither party has separately briefed the merits of the state-law claims.

Summary judgment is appropriate if defendants show that "there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on defendants' motion for summary judgment, the court views all facts and draws all reasonable inferences in the light most favorable to the Ryans. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248.

## A. Status of claims against Sheriff Meier and Deputy Poppe

The court must begin with a preliminary issue, because plaintiffs' complaint does not make clear whether they are suing Sheriff Meier and Deputy Poppe in their official or their individual capacities. A suit against a public official in his or her official capacity is effectively a suit against the government entity itself. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). A suit against the official in his or her individual capacity is directed at establishing the official's personal liability for his or her own acts that deprived a plaintiff of his or her rights. *See Moore v. State of Ind.,* 999 F.2d 1125, 1129 (7th Cir. 1993).

Defendants invite the court to decide this question by the presumption invoked in *Yeksigian v. Nappi*: "[i]n the absence of any express statement that the parties are being sued in their individual capacities, an allegation that the defendants were acting under color of law generally is construed as a suit against the defendants in their official capacities only." 900 F.2d 101, 104 (7th Cir. 1990) (citing *Meadows v. Indiana,* 854 F.2d 1068, 1069 (7th Cir. 1988). But the presumption is outmoded. Courts in this circuit no longer entertain a presumption of an

official capacity suit after *Hill v. Shelander,* 924 F.2d 1370, 1373-74 (7th Cir. 1991). In *Miller v. Smith,* the Seventh Circuit explained:

> [In *Hill,* we] spelled out a new regime for § 1983 claims that do not specify the capacity in which the defendant has been sued: Where the plaintiff seeks injunctive relief from official policies or customs, the defendant has been sued in her official capacity; where the plaintiff alleges tortious conduct of an individual acting under color of state law, the defendant has been sued in her individual capacity.

220 F.3d 491, 494 (7th Cir. 2000) (citations and quotation marks omitted).

Under the *Miller* approach, plaintiffs' claims against Sheriff Meier and Deputy Poppe are properly interpreted as individual capacity suits. Plaintiffs refer to Sawyer County's "policies and customs," but they do not really identify any objectionable ones. They do not seek injunctive relief, but they do seek punitive damages, both of which are factors that point toward an individual capacity suit. Plaintiffs clearly allege Deputy Poppe's individual tortious conduct in arresting Keith. It is perhaps a closer call with Sheriff Meier, but plaintiffs allege that he was personally involved in the seizure of the tractor and go-cart after the fact when he implicitly ratified the conduct of the deputies by refusing to do anything about it.

The decisive factor in this case is that plaintiffs also bring a claim against Sawyer County itself, which would make official capacity claims against Sheriff Meier and Deputy Poppe redundant. The court would construe official capacity claims against Meier and Poppe as claims against Sawyer County itself under *Kentucky,* 473 U.S. at 166 ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *see Yeksigian,* 900 F.2d at 103. Accordingly, the court will give plaintiffs the benefit of the doubt and construe their claims against Sheriff Meier and Deputy Poppe as individual capacity claims. Any claims based on the policies or customs of the sheriff's department will be captured by the Ryan's claims against the county itself.

8

**B.  Constitutional claims against Sawyer County**

The Ryans assert § 1983 claims against Sawyer County for all three incidents at issue. Under *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), municipalities and other local government units are "among those persons to whom § 1983 applies." However, Sawyer County "cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691. Rather, Sawyer County may be sued only when its officers inflict an injury in the execution of the government's policy or custom. *Id.* at 694. The goal is to "distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). "Misbehaving employees are responsible for their own conduct[;] 'units of local government are responsible only for their policies rather than misconduct by their workers.'" *Lewis v. City of Chi.*, 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007)).

To establish Sawyer County's liability, the Ryans must show the existence of an official policy or an established custom that is "the moving force" behind the deprivation of their constitutional rights. *Estate of Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)); *see also Monell*, 436 U.S. at 694. The Ryans can establish a policy or custom through: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Estate of Sims*, 506 F.3d at 515 (citing *Lewis*, 496 F.3d at 656). The Ryans do not allege they that they were injured by any

9

express policy, nor do they point to any permanent, widespread practice. Rather, they take the third option, alleging that Sheriff Meier is a person with final policymaking authority, and thus his conduct as sheriff necessarily reflects the policy or custom of Sawyer County. Dkt. 1-1; Dkt. 25, at 6-7. This argument fails.[3]

Plaintiffs contend (and defendants are willing to concede) that Sheriff Meier has final policymaking authority. But this is wrong, at least in part. Contrary to plaintiffs' assertion, Dkt. 25, at 7, a Wisconsin sheriff does not have universal final policymaking authority on everything within the purview of the department. A sheriff does retain the discretion to choose the ways and means of preserving his constitutionally protected duties, such as making the work assignments of deputies. *Dunn Cnty. v. Wisconsin Employment Relations Comm'n*, 2006 WI App 120, ¶ 15, 293 Wis. 2d 637, 649, 718 N.W.2d 138, 144. But a sheriff's policymaking authority is also limited by statute, the Wisconsin and federal constitutions, and even by collective bargaining agreements. *Id*. It is thus far too simplistic to say that the sheriff "has final policymaking authority" and leave it at that. Under plaintiffs' theory, any action by a sheriff would be the action of a person with final policymaking authority, which would thus subject the county to liability for anything the sheriff does on the job. This is not the law.

Plaintiffs must identify some decision by Sheriff Meier that reflects his policymaking decision in an area in which he is the final policymaking authority. Plaintiffs have failed to do so. The only decision by Sheriff Meier about which plaintiffs complain is his decision not to follow up on their complaint after the go-cart incident. Plaintiffs do not point to any policy reflected in this decision, let alone a policy in an area in which Sheriff Meier is the final policymaking authority. Sheriff Meier simply determined that this particular complaint did not

---

[3] The court notes that the Ryans do not contend that Deputy Poppe has any policymaking authority. Thus, any official-capacity claim against her, or any claim directly against the county based on her individual action, fails.

warrant further action. Even if he were wrong to dismiss the Ryans' complaint (and nothing in the record suggests that he was), this single decision does not reflect his policymaking authority. Sheriff Meier's liability for his treatment of the Ryans' complaint, if any, is solely his, not the county's.

The court concludes that defendants are entitled to summary judgment dismissing plaintiffs' claims against Sawyer County and any official capacity claims against Sheriff Meier and Deputy Poppe.

## C. Individual capacity claims against Sheriff Meier

A valid § 1983 claim for damages against an official in his individual capacity requires a showing of direct responsibility for the improper action. *Moore,* 999 F.2d at 1129. In other words, "an individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Id.* (quoting *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir. 1983)).

The fundamental problem for the Ryans is that they cannot and do not dispute that Meier did not personally cause or participate in any of the three incidents at issue. The Ryans agree that Meier "did not in any way make any decisions, participate or condone any law enforcement decisions" relating to the baseball incident, and that he did not make decisions relating to or condone the arrest incident. Dkt. 15, at 13, 16, and Dkt. 34. They also agree that Meier "in no way personally participated in any decision made with regard to what law enforcement activities would take place" with respect to the go-cart incident. Dkt. 15, at 7, and Dkt. 34. The Ryans base their claims against Sheriff Meier solely on his handling of the complaint they made the day after the go-cart incident. The court has already concluded that Sawyer County is not liable for Sheriff Meier's handling of the complaint. But the question here

11

is whether Meier could be individually liable as a consequence of his decision to do nothing about the Ryans' complaint.

Generally, individual liability attaches only to those who directly participate in the constitutional deprivation. *Cygnar v. City of Chicago*, 865 F.2d 827, 847 (7th Cir. 1989). Showing that an official failed to remediate the deprivation is not, in itself, sufficient. Thus, Sheriff Meier is not liable merely because he failed to investigate, correct, or take punitive action in response to misconduct. *Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998); *Fiorenzo v. Nolan*, 965 F.2d 348, 351 (7th Cir. 1992). Individual liability would attach to Sheriff Meier if he knew of an abusive practice and actually condoned it. *Kernats v. O'Sullivan*, 35 F.3d 1171, 1182 (7th Cir. 1994). At a minimum, the Ryans would have to show that Sheriff Meier was deliberately indifferent to complaints of abusive practices, so that it could be said that he has effectively adopted the abusive practices as county policy. *Wilson v. City of Chi.*, 6 F.3d 1233, 1240 (7th Cir. 1993) (citations omitted).

The Ryans use the phrase "deliberate and reckless indifference," Dkt. 25, at 6-7, to describe Sheriff Meier's reaction to their complaint. But they fall far short of adducing evidence sufficient to establish this level of intent. The day after the go-cart incident, the Ryans complained to Sheriff Meier that his deputies made a warrantless and unjustified entry onto their property, issued orders to both Keith and Linda, physically assaulted and verbally abused Linda, and facilitated the removal of the tractor and go-cart from their premises even though Linda offered to show proof of ownership of the go-cart. Sheriff Meier told the Ryans that he was "done with" the incident and that he would be "doing nothing about it."

The Ryans' evidence shows only that Sheriff Meier did not investigate, correct, or take punitive action in response to their report of misconduct by his deputies. This is not a sufficient showing under *Baskin*. 138 F.3d at 705. The Ryans do not adduce any facts to show that Sawyer

12

County deputies engaged in a pattern of abuse, or that Sheriff Meier was aware such a pattern. Even in the case of the single incident reported by the Ryans, the Ryans adduce no evidence that Sheriff Meier believed that his deputies had committed any act of misconduct. The Ryans adduce no evidence showing Sheriff Meier's knowledge or investigation of the go-cart incident prior to their meeting with him. In sum, all the Ryans can show is that Sheriff Meier did not follow up on their complaint. But they have no evidence to show what Sheriff Meier knew or thought about the conduct of his deputies during the incident.

Defendants are entitled to summary judgment on the Ryans' individual capacity claims against Sheriff Meier.

### D.  Individual capacity claims against Deputy Poppe

The Ryans allege § 1983 individual capacity claims against Deputy Poppe for falsely arresting and imprisoning Keith in September 2011. Poppe would be liable for false arrest or imprisonment if Keith were detained without probable cause. *Hall v. Gearhart*, No. 12-cv-788, 2014 WL 2002809, at *6 (W.D. Wis. May 14, 2014) (citation omitted). Probable cause is an absolute defense to any § 1983 claim for wrongful arrest or false imprisonment. *Gutierrez v. Kermon,* 722 F.3d 1003, 1007 (7th Cir. 2013); *Mustafa v. City of Chi.,* 442 F.3d 544, 547 (7th Cir. 2006); *Schertz v. Waupaca Cnty.*, 875 F.2d 578, 582 (7th Cir. 1989).

"An officer has probable cause to make an arrest only when the facts and circumstances within his knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect has committed an offense." *Reher v. Vivo,* 656 F.3d 772, 776 (7th Cir. 2011). Probable cause relies on the officer's common-sense judgment based on the totality of the circumstances. *United States v. Reed,* 443 F.3d 600, 603 (7th Cir. 2006). "The test is an objective one and evaluates whether probable cause existed on

13

the facts as they appeared to a reasonable police officer, even if the reasonable belief of that officer is ultimately found to be incorrect." *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003) (citation omitted).

The information available to Deputy Poppe at the time of the arresting incident included John's and Keith's competing versions of their argument. John reported that Keith was yelling, swearing, and putting his fist in John's face in a threatening manner. The account of John's brother, Steve, was consistent with John's. Keith reported that, although he asked John and Steve to vacate the premises, Keith was not abusive, threatening, or disorderly. Deputy Poppe was informed that there were witnesses to the argument, and she interviewed one, Valerie Stone.[4] Dkt. 19-1 and Dkt. 32, at 30. Stone left the immediate scene as the argument escalated, but her account tended to confirm John's account of the beginning of the argument, and that Keith used somewhat aggressive language with Steve. Dkts. 19-1, 28-8.

With this informational background, the propriety of Deputy Poppe's probable cause determination then depends on the applicable criminal statute. *Stokes v. Bd. of Educ. of the City of Chi.,* 599 F.3d 617, 622 (7th Cir. 2010). Wisconsin's disorderly conduct statute provides:

> (1) Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor.

Wis. Stat. § 947.01. Thus, a typical disorderly conduct offense in Wisconsin has two elements: (1) "that the defendant engaged in violent, abusive, indecent, profane, boisterous, unreasonably loud, or similar disorderly conduct" and (2) "that the defendant's conduct occurred under

---

[4] In opposition to defendants' motion for summary judgment, the Ryans submit two additional witness statements. Dkts. 28-6, 28-7. Defendants contend that the witness statements are inadmissible as unauthenticated and hearsay. The evidentiary dispute is immaterial. What matters is the information available to Deputy Poppe, and she did not speak to the additional two witnesses.

14

circumstances where such conduct tends to cause or provoke a disturbance." *State v. Schwebke,* 2002 WI 55, ¶ 24, 53 Wis. 2d 1, 17, 644 N.W.2d 666, 674 (2002) (internal quotation marks omitted). Wisconsin courts have interpreted the phrase "similar disorderly conduct" broadly to mean "conduct of a type not previously enumerated but similar thereto in having a tendency to disrupt good order and to provoke a disturbance." *Id.* (internal quotation marks omitted).

In view of the information available to Deputy Poppe and Wisconsin's disorderly conduct statute, the court determines that Deputy Poppe had probable cause to arrest Keith for disorderly conduct. Deputy Poppe credited John's version of the events, under which Keith had been loud, abusive, and threatening. Stone's witness account gave no reason to doubt John's version of the events. Keith would have been entitled to contest all the underlying facts at trial on the disorderly conduct charge. But on the record of this case, the Ryans provide no reason to second-guess Deputy Poppe's decision to believe John's version of the events. Probable cause "requires only that a probability or substantial chance of criminal activity exists; it does not require the existence of criminal activity to be more likely true than not true." *Mucha v. Vill. of Oak Brook,* 650 F.3d 1053, 1056-57 (7th Cir. 2011). The undisputed facts of this case show that Deputy Poppe had reason to believe that Keith had probably committed disorderly conduct.

But even if Deputy Poppe had made the wrong call, she is entitled to qualified immunity. An officer "is entitled to qualified immunity in a false-arrest case when, if there is no probable cause, 'a reasonable officer could have mistakenly believed that probable cause existed.'" *Fleming v. Livingston Cnty., Ill.,* 674 F.3d 874, 880 (7th Cir. 2012) (quoting *Humphrey v. Staszak,* 148 F.3d 719, 725 (7th Cir. 1998)); *see also Reher,* 656 F.3d at 777 (granting qualified immunity to officer who could have reasonably, but mistakenly, believed that plaintiff had committed disorderly conduct even though the information available to the officer at the time was probably too vague to support an arrest). Qualified immunity provides "ample protection to all but the

15

plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Law enforcement officers are given this broad protection, not as a license to violate constitutional rights, but to safeguard their ability to act in the public interest even in the face of ambiguity, without fear of being sued. *See Hunter v. Bryant*, 502 U.S. 224, 228-29 (1991); *see also Malinowski v. DeLuca*, 177 F.3d 623, 626-27 (7th Cir. 1999) (articulating policy reasons behind the immunity). Although qualified immunity is an affirmative defense, the burden of defeating an assertion of qualified immunity rests with the plaintiff. *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999).

The Ryans cannot meet their burden here. The Ryans argue that summary judgment is inappropriate because there are disputed issues of fact that must go to a jury. Under Keith's version of the facts, which the court must credit, he was not disorderly and should not have been arrested. But the Ryans miss a critical point, which is that the question here is not Keith's ultimate guilt or innocence. What matters is what Deputy Poppe knew about the incident, and what she knew is not disputed. The Ryans do not dispute that Deputy Poppe had both John's and Keith's versions of the events. The Ryans contend that Deputy Poppe should have talked to two more witnesses, and that she should have reached a different conclusion based on what she knew. But the Ryans do not contest that Deputy Poppe had information that, if believed, would support her decision to arrest Keith. This is not a case like *Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003), in which the arresting officer and the plaintiff presented diametrically opposed accounts of the officer's conduct. Here, the parties do not meaningfully dispute Deputy Poppe's conduct, or the information on which she acted. The Ryans simply think she made the wrong call and arrested the wrong party. The court must view the incident from the perspective of a reasonable person in the position of the arresting officer. *Wheeler v. Lawson,* 539 F.3d 629, 634

(7th Cir. 2008). Stepping into Deputy Poppe's shoes, the court concludes that her assessment was reasonable, even if it were mistaken.

Deputy Poppe is entitled to summary judgment on the claim against her.

### E.  The conduct of the other deputies

The Ryans do not bring claims against the Sawyer County deputies who were most directly involved with the go-cart incident and the baseball incident. Accordingly, the court would not have to decide whether Deputy Anderson, Investigator Ross, or any other Sawyer County deputy would be liable to the Ryans. Nevertheless, the court will comment briefly on the go-cart and baseball incidents because there are additional reasons why the Ryans' claims are ultimately doomed. If there is no underlying constitutional deprivation, there is nothing for Sawyer County or any of its employees to be held liable for. *Sallenger*, 630 F.3d at 504.

As for the go-cart incident, Sawyer County deputies went to the Edelweiss Motel in response to Drake's telephone call reporting a family dispute and a possible fight. Deputies properly responded to this call, and they were entitled to enter the Ryan property in doing so. *United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993). Moreover, the Ryan property was a motel, and the Ryans do not contend that Sawyer County deputies entered any private part of the Ryan residence. It appears that the deputies stayed on the parts of the property accessible to the public. Thus, any claim that Sawyer County deputies violated the Ryans' Fourth Amendment rights by a warrantless entry would fail.

As for the alleged seizure of the go-cart: Sawyer County deputies did not seize the go-cart, Drake did. The fact that Sawyer County deputies were present when Drake took the go-cart does not turn the incident into a police seizure. Sawyer County deputies would be liable for Drake's seizure of the Ryans' property only if the deputies conspired with Drake to take the go-

cart, and the deputies knew that the taking was illegal. *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005). The Ryans adduce no evidence to support such a claim. Sawyer County deputies responded to a report of a family fight. The deputies facilitated a more or less peaceful resolution of the property dispute that was fueling the fight. The Ryans complain that the deputies would not evaluate the documents that Linda offered to prove their ownership of the go-cart. The deputies managed to keep the peace, and the court will not second guess their decisions concerning who got possession of the go-cart. That kind of intra-family dispute would have been more properly addressed to Judge Judy, to whom the family turned to resolve at least some of their disputes. Dkt. 14, at 29, and Dkt. 25, at 5-6.

As for the Babe Ruth baseballs, the Ryans do not object to the search warrant or the seizure of the firearms. But they do not get far with their argument that the baseballs were outside the scope of the warrant, which was directed to firearms and ammunition. The search did not have to end as soon as the deputies found the first firearm, because there may have been more guns and ammunition in the residence. The baseballs had been reported stolen, so when Investigator Ross found them, the baseballs were evidence of a crime, and thus appropriately seized even if the warrant was not directed at them specifically. *Russell v. Harms*, 397 F.3d 458, 465 (7th Cir. 2005).

The return of the baseballs to Maureen Ryan, however, is more problematic. Although Investigator Ross considered Maureen to be the "undisputed" owner, the question of ownership had not been formally resolved when he returned the baseballs to her. Moreover, he did so without giving notice to Keith, from whom the baseballs were taken. But the Ryans have adduced no evidence that the allegedly improper return of the baseballs to Maureen was made according to some county policy or custom. Thus, the resulting deprivation of property was the kind of "random and unauthorized" seizure that does not subject the county to liability. And

18

the Ryans have not made any claim against Investigator Ross, the person who actually gave the baseballs to Maureen.

The Ryans face a further problem: they have an adequate post-deprivation remedy for Investigator Ross's random and unauthorized taking of the baseballs. Wisconsin state statutes provide a process by which a person claiming a right to property seized pursuant to a search warrant can recover the property when it is not needed as evidence, and assuming it is not contraband. Wis. Stat. § 968.20(1). In this case, it was too late for that process. Accordingly, the Ryans pursued (albeit tardily) the process under Wis. Stat. § 893.80(1d) for claims against governmental bodies. Their claim was disallowed by Sawyer County. Dkt. 1-1, ¶ 42. The Ryans will not succeed in pressing this claim (see the next section below), but the state did provide an adequate post-deprivation remedy. The Ryans do not have a viable claim for the deprivation of property without due process of law when the government affords an adequate post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 534 (1984).

In sum, even if the Ryans had pursued claims against the Sawyer County deputies involved in the incidents with the go-cart and the baseballs, the record establishes that none of these deputies violated the Ryans' constitutional rights.

## F.  Tort claim against Sawyer County

Section II of the Ryans' complaint concerns "Claims Arising Under State Law." This section is far from crystal clear, but it appears that in addition to asserting claims under the Wisconsin constitution for violation of the their due process rights, the Ryans are also pressing a common law tort claim against Sawyer County for the wrongful taking of the Babe Ruth baseballs. Defendants move for summary judgment on this common law claim on the grounds that the Ryans failed to comply with the notice of claim provisions in Wis. Stat. § 893.80(1d).

The Ryans concede that they did not strictly comply with the notice of claim requirements, because their notice of claim was filed more than 120 after the events giving rise to the claim. The baseballs were seized on September 3, 2010, and returned to Maureen Ryan on October 8, 2010. The Ryans tell this court that they learned of the delivery of the baseballs to Maureen in "March 2013" without giving the precise date. They contend that they told then-sheriff Mark Kelsey that they "would be making a claim against the Sheriff's Department for the value of the baseballs." Dkt. 28, ¶ 65. According to the complaint (but without evidentiary support), the Ryans presented a written notice of claim to Sawyer County on or about July 22, 2013.

The Ryans make essentially two arguments for why they should be excused from strict compliance with the notice of claim provisions. First, they contend that they should be entitled to a "discovery rule" and that the notice of claim clock started only when they discovered the disposition of the baseballs. The Ryans provide no authority that supports the application of a discovery rule to the notice of claim provision, and its plain language seems to foreclose such a reading. Wisconsin courts have rejected the application of the discovery rule to similar statutes. *See, e.g., Oney v. Schrauth*, 197 Wis. 2d 891, 901, 541 N.W.2d 229, 232 (Ct. App. 1995). In addition, their claim to the benefit of the discovery rule is not supported by the facts. Although the Ryans do not indicate the precise day in March 2013 on which they learned of the disposition of the baseballs, court records show that Linda appeared at a hearing on March 6, 2013, to request the return of the items seized pursuant to the warrant. Thus, even if the Ryans had the benefit of the discovery rule, they waited more than 120 days after March 6 to file a written notice of claim with the county.

The second argument the Ryans make for excusing their failure to strictly comply with the notice of claim requirement is that they *substantially* complied by telling then-sheriff Kelsey

20

about their claim. Pursuant to Wis. Stat. § 893.80(1d)(a), substantial compliance is sufficient if (1) the governmental entity has actual notice, and (2) failure to give the requisite notice is not prejudicial to the governmental entity. The Ryans bear the burden to show substantial compliance. *E-Z Roll Off, LLC v. Cnty. of Oneida*, 2011 WI 71, ¶ 49, 335 Wis. 2d 720, 747, 800 N.W.2d 421, 435. Mere assertions are not enough: the Ryans would have to adduce specific facts showing there is a genuine issue for trial on the issue of prejudice. *Id.*

The Ryans have adduced no evidence whatsoever on the issue of prejudice. Accordingly, following the Wisconsin Supreme Court's rationale in *E-Z Roll Off*, this court need not consider whether the Ryans can show actual notice, because the failure to adduce evidence showing a lack of prejudice is fatal to their attempt to show substantial compliance. This would be a very hard showing to make, because the Ryans should have presented their claim within 120 days of October 8, 2010, at the latest, but they did not do so for nearly three years. The Ryans knew that the baseballs had been seized on the grounds that Keith had stolen them from Maureen. If the Ryans could show that Keith owned the baseballs, they should have pressed their claim of ownership long before they did. In sum, there is no reason why the Ryans should be excused from strict compliance with the written notice of claim requirement in Wis. Stat. § 893.80(1d).

Defendants are entitled to summary judgment on the Ryans' common law claim for the value of the baseballs.

### G. State-law constitutional claims

The Ryans also brought state-law constitutional claims mirroring their federal claims with respect to the baseball and arrest incidents. The parties agree that the Ryans' rights under the United States Constitution and the Wisconsin constitution are substantively the same. Dkt. 25, at 19, and Dkt. 32, at 40. Neither party has separately briefed the state constitutional

claims. Accordingly, defendants are also entitled to summary judgment on the Ryans' state-law constitutional claims for the same reasons they are entitled to summary judgment on the federal constitutional claims.

ORDER

IT IS ORDERED that:

1.  Defendants' motion for summary judgment, Dkt. 13, is GRANTED.

2.  The clerk is ordered to enter judgment for defendants and close this case.

Entered this 11th day of December, 2014.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge